IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
UNITED STATES OF AMERICA     )
                             )
     v.                      )     CRIMINAL ACTION NO.
                             )        2:09cr183-MHT
WILLIAM WALTER OHORO         )            (WO)
```

## OPINION AND ORDER

Four of the six counts of an indictment against
defendant William Walter Ohoro are based on guns and
drugs seized during a July 2009 search of his residence,
conducted pursuant to a warrant.  The issue now before
the court is whether Ohoro is entitled to a hearing,
pursuant to Franks v. Delaware, 438 U.S. 154 (1978), on
the veracity of the affidavit submitted in support of the
warrant.  For the reasons that follow, Ohoro's request
for a Franks hearing will be granted in part and denied
in part.

## I.  BACKGROUND

On the morning of July 28, 2009, Officer Tijuan Jones
of the Autauga County Sheriff's Office was changing the

tape in a recording device that was positioned to monitor Ohoro's residence.   Officer Jones had initiated video surveillance of the house approximately two weeks before, based on a tip from a confidential informant.  Up to that point, the recording device had not captured any criminal activity.

While changing the tape, Officer Jones noticed Ohoro leaving the residence in a vehicle.[1]   Based on his surveillance, he concluded that "it was uncommon for a person to be exiting or leaving that residence that early in the morning[,] ... [so he] got into a vehicle and [he] attempted to make contact with that vehicle."  Evid. Hr'g Tr. at 13:9-14 (Doc. No. 62).

Because he left shortly after the vehicle, it took Officer Jones "a while to gain sight of [it] again."  Id. at 13:16.  At some point, he determined that the vehicle was traveling at a speed in excess of the posted 55-

_____

1.  It is unclear at what point Officer Jones realized that the man in the vehicle was Ohoro.

miles-per-hour speed limit.  Officer Jones's car was not equipped with a radar gun, nor was the speedometer "certified and calibrated."[2]  Nonetheless, he used a technique called "pacing" to determine that the vehicle was moving at "about seventy miles an hour or thereabout."  Id. at 13:24-25.[3]  After failing "to get a marked unit to respond, ... [he] pulled [the car] over about two miles from the point where the initial pace started."  Id. at 15:8-10.

_____

2.  Officer Jones later explained that, "Due to the fact I didn't have the radar or certified calibration, I wrote [Ohoro] a warning citation for going approximately seventy miles per hour in a fifty-five mile an hour speeding zone."  Evid. Hr'g Tr. at 15:12-15.  He could not "recall whether the warning ticket was given on the side of the road or back at the office."  Id. at 57:7-9.

3.  According to Officer Jones, pacing is a technique commonly used in law enforcement by "those who do not have a radar detector."  Evid. Hr'g Tr. at 14:16.  He explained this technique as follows: "I counted one second, two seconds before my vehicle passed the same fixed object and got a distance between my vehicle and his vehicle to establish a pace on that vehicle."  Id. at 14:9-11.

Officer Jones then approached the vehicle and asked Ohoro to present his driver's license and proof of insurance. He maintains that, "When the window came down there was the odor of [burnt] marijuana coming from the cockpit area of the vehicle." Id. at 16:16-18. He then requested the assistance of a canine unit. His partner, Officer James Steele, arrived on the scene with a dog identified as K-9 Hobbs. Officer Jones later explained that, "Once I smelled the odor of marijuana, burnt marijuana, I didn't need [Ohoro's] permission to search that vehicle at that particular time. I called the canine just for secondary precautions." Id. at 57:19-22.

When Officer Steele arrived, Officer Jones informed him "that upon his approach to the vehicle and in talking with the driver ... he thought he had smelled an odor of marijuana." Id. at 82:14-15. Officer Steele walked Hobbs around the vehicle and the dog "alerted" in "the vicinity of the door seams ... on the passenger and also on the driver's side of the vehicle." Id. at 83:9-10.

4

Officer Steele later provided documentary proof that he had completed a 160-hour "K-9 Detection Handler Course" conducted by the Central Alabama Police K-9 Training Association ("CAP") in April of 2000, see Gov.'s Ex. 13, and testified that he had completed the course with K-9 Hobbs.  Documents also show that, on March 31, 2004, and March 28, 2008, Hobbs was certified by CAP to detect marijuana, methamphetamine and cocaine.  See Gov.'s Exs. 14 & 15.[4]  Despite the lack of additional documentary evidence, Officer Steele testified that Hobbs was certified "annually up to the year two thousand and nine."  Evid. Hr.'g Tr. at 97:7.; id. at 77:19-20 ("[Hobbs] was certified every year from our acquisition of the canine until his retirement.").[5]  In addition to,

_____

4. The 2004 certificate also indicates that Hobbs was certified to detect heroin.

5. Officer Steele explained the gaps in Hobbs's records, testifying that:

> "There was a period of time after having
>                                     (continued...)

5

or as part of, the yearly certification, Officer Steele and Hobbs also received a minimum of 16 hours of training from CAP each month. Both officers testified that Hobbs had been a reliable drug-detecting dog. Indeed, Officer Steele testified that he "would ... be surprised if [Hobbs's] false [positive] rate was more than five, eight per cent." Id. at 107:4-5.

Following Hobbs's alert on the door seams, Officer Jones and Officer Steele conducted a search of Ohoro's vehicle. They did not "find any joints or evidence of burned marijuana in the car." Id. at 57:23-24. Nor did

------

(...continued)
> Hobbs, that it was easier to maintain his records on computer because I would work out of the office and out of the vehicle. I maintained his records on ... what I would call a thumb drive. And unfortunately that thumb drive was lost during a call. So some of those records were lost."

Evid. Hr'g Tr. at 94:10-15. He further explained that: "We have also moved our office space two times moving out of our old facility to a temporary facility back to a new facility. So I know a lot of things could have been misplaced." Id. at 98:18-21.

they discover any other drugs or drug paraphernalia during their search.  However, the officers did discover a bag containing $ 4,400.00.

When asked about the money, "Ohoro stated that he was about to make a [bank] deposit and get groceries."  Id. at 20:23-25.  He later admitted that he was unemployed, but also told officers "that he had recently sold two computers--one for nine hundred dollars, and the other for twelve hundred and fifty dollars," and "that he recently received two cash advances from credit[] cards totaling twelve thousand dollars."  Id. at 64:2-4, 6-8.  Officer Jones admitted that he had no reason to doubt these statements.

At some point during the vehicle search, Hobbs alerted on both the money and the bag.  Officer Jones does not recall Hobbs alerting on anything in the car "other than the bag of money."  Id. at 58:6-7. Moreover, Officer Steele indicated that, "If the money was inside the vehicle at the time [he] did [his] exter[n]al search,

then [it is] possible [Hobbs] smelled the money in the vehicle." Id. at 84:23-25.

Following the search, Ohoro, driving his own vehicle, accompanied the officers to the sheriff's office. While Officer Steele was talking with Ohoro, Officer Jones typed a search-warrant affidavit for Ohoro's residence. The affidavit states, in pertinent part, that:

> "The facts tending to establish the foregoing grounds for the issuance of a search warrant are as follows:
>
> "Within the past two weeks, the Autauga County Sheriff's Office has received information concerning the illegal sale of narcotics being sold and/or concealed at the residence of William Walter Ohoro. This source of information related to this office that Walter Ohoro has sold Marijuana and Methamphetamine to them in the past. [The source] also stated that William Ohoro is a convicted felon and possess[es] firearms at the residence of 2837 River Bend Road Autaugaville, Alabama. This information was confirmed through a check of NCIC revealing numerous felonies.
>
> "While on routine patrol contact was made with William Ohoro for speeding, there was a[n] odor of burnt marijuana emitting from the cock pit area of the

8

vehicle.  Sgt. J. Steele was called to utilize his K-9 to conduct a[n] exterior sniff around the vehicle driven by William Ohoro.  The K-9 alerted on both driver and passenger doors.  While conducting a search of this vehicle, a money bag was located containing a large amount of U.S. Currency totaling $ 4,400.  K-9 Hobbs gave a positive alert on the money bag and currency. Mr. Ohoro stated that he had just left home and was on his way to the bank and [to] get groceries[.] Mr. Ohoro also stated that he is not gainfully employed."

Aff. at 1 (Doc. No. 36-2).  Officer Jones then presented the affidavit to a judge, who issued the requested search warrant.  Officer Jones later explained that he had not previously sought a search warrant for Ohoro's residence because, "I didn't have the information that I had at this particular time due to the traffic stop and the odor of marijuana with him leaving that residence."  Evid. Hr'g Tr. at 28:10-12.  Law enforcement officers subsequently searched Ohoro's home, discovering the guns

9

and drugs that provide the basis for counts one through four of the indictment against Ohoro.[6]

In the days that followed, Ohoro was interviewed by law enforcement agents.  During an interview on August 3, Ohoro spoke at length about his involvement in the sale of marijuana and his use of methamphetamine.  He also stated that, "It's been over 20 years since I've smoked pot."  Interview Tr. at 66:5-7 (Doc. No. 66-6); see also Gov.'s Ex. 11.  He explained that: "It makes me stupid, slow.  And I don't like that."  Id. at 66:12-14.

Following his arrest, Ohoro filed a "Motion To Suppress And For Return Of Property."  Mot. to Suppress at 1 (Doc. No. 36).  This motion included a request for a hearing, pursuant to Franks v. Delaware, 438 U.S. 154 (1978), on the veracity of the affidavit supporting the search warrant.  Mot. to Suppress at 10 n.6.  Somewhat confusingly, Ohoro "based" his request for the Franks

---

6.  The drugs supporting counts five and six were discovered during a later search of the residence.

10

hearing "on the information provided in [the] motion <u>and</u> <u>on the</u> information expected to be elicited at an evidentiary hearing on this matter."   <u>Id</u>.   (emphasis added).   He added that he did "not object to the two hearings being conducted simultaneously."   <u>Id</u>.

The magistrate judge assigned to consider Ohoro's suppression motion ordered "that a hearing on [Ohoro's] Motions is set for February 4, 2010."   Order at 1 (Doc. No. 38).[7]   He later granted a motion to continue the hearing and eventually ordered "that a hearing on the Motions is set for March 2, 2010."   Order at 1 (Doc. No. 48).   Neither order made reference to Ohoro's request for a <u>Franks</u> hearing or his stated intention to base said request, in part, "on the information expected to be elicited at an evidentiary hearing on this matter."

---

7.   The order noted that Ohoro had "filed the following pretrial motions: Motion To Inspect Jury List For Both The Grand Jury And The Petit Jury, Motion To Disclose Information Related To Confidential Informant[,] ... and Motion To Suppress And For Return Of Property." Order at 1 (docket citations omitted).

11

On March 1, counsel met for a pre-trial conference
before the magistrate judge.   During the hearing, the
magistrate judge informed defense counsel that "there
hasn't been a sufficient showing under Franks[,] ... [s]o
the only thing we're going to be arguing tomorrow is a
motion to suppress."   Pre-trial Conf. Tr. at 2:12-14
(Doc. No. 56).   When defense counsel responded, "I'm
sorry.   Under Franks, Your Honor?," the magistrate judge
stated, "Yes.   We cannot talk about all of it tomorrow.
The only thing [you should] be prepared to argue is the
motion to suppress itself.   All right?"   Id. at 2:19-20.
There was no immediate response from defense counsel.

Later in the conference, however, the following
exchange took place between defense counsel and the
magistrate judge:

> "Mr. Karakatsanis: ... [W]e'll be
> arguing and eliciting a lot of testimony
> at the hearing tomorrow concerning the
> reliability of ... [the confidential
> informant and the traffic stop].  And it
> was my understanding at least that the
> hearing tomorrow was to test--all of the
> circumstances of the case, including--

"The Court: Wrong.  You have to make a showing ... to even determine whether you're going to get an evidentiary hearing.  We don't think that that's been shown already.

"Mr. Karakatsanis: Your Honor --

"The Court: But we can deal with this tomorrow.  Today's the time for the pretrial.  So tomorrow we'll take up any of the issues, but that's how we're going to deal with it.  All right."

Id. at 6:6-19.

During the hearing on the following day, the magistrate judge reiterated his position that Ohoro had not met the requisite burden for a Franks hearing. Defense counsel later stated, "I would ... like to proffer a number of facts for the record that would have been shown I believe to support the Franks claim[,] ... [a]nd if the Court prefers, I can submit that proffer in writing at the end of the day."  Evid. Hr'g. Tr. at 9:3-8.  The magistrate judge responded: "Well the proffer is made before an evidentiary hearing because that's what needs to be done in order to get the evidentiary hearing,

13

and we've basically gone over that before.  But we can take that issue up later."  Id. at 9:9-12.

The issue was taken up later when defense counsel again attempted to offer evidence that he asserted would "be very relevant for the Franks issue."  Id. at 121:20. The magistrate judge refused the evidence, stating that: "[T]he Court has already said that you haven't presented initial information to get an evidentiary hearing which is what you're trying to do through this witness now for Franks.  Read the law on Franks.  Now let's proceed, please."  Id. at 121:22-122:1.  Shortly thereafter, the hearing concluded.

The magistrate judge filed a recommendation to the court that Ohoro's motion for a Franks hearing be denied. Ohoro objects to that recommendation.  He also proffers additional evidence to the court.  See Proffer (Doc. No. 66).  According to Ohoro, this evidence was rejected by the magistrate judge "because it related to challenging the veracity, credibility, and completeness of the

14

information contained in the search warrant ... [and]
[t]he Court determined that it would not hear any
evidence or argument relating to Mr. Ohoro's invocation
of <u>Franks v. Delaware</u>." Notice at 1 (Doc. No. 65). The
government has not objected to Ohoro's proffer.

The question now before the court is whether Ohoro
has proffered evidence sufficient to entitle him to an
evidentiary hearing on the veracity of the affidavit
supporting the above-discussed warrant to search his
home.

## II.  DISCUSSION

### A.  <u>Franks v. Delaware</u>

The Fourth Amendment to the United States
Constitution protects, "The right of the people to be
secure in their persons, houses, papers, and effects,
against unreasonable searches and seizures." U.S. Const.
amend IV.  It states, in pertinent part, that this right
"shall not be violated, and no Warrants shall issue, but

upon probable cause, <u>supported by Oath or affirmation</u>."
<u>Id</u>. (emphasis added).

In order to give meaningful effect to the protection
provided by the Fourth Amendment, the United States
Supreme Court has recognized a "right ... to challenge
the truthfulness of factual statements made in an
affidavit supporting a warrant." <u>Franks v. Delaware</u>, 438
U.S. 154, 155 (1978).  As the Court observed, "a flat ban
on impeachment of veracity could denude the probable-
cause requirement of all real meaning."  <u>Id</u>. at 168.
"The requirement that a warrant not issue 'but upon
probable cause, supported by Oath or affirmation,' would
be reduced to a nullity if a police officer was able to
use deliberately falsified allegations to demonstrate
probable cause."  <u>Id</u>.

While <u>Franks</u> thus rejected "an <u>absolute</u> ban on post-
search impeachment of veracity," the "rule it announced
... has a limited scope, both in regard to when exclusion
of the seized evidence is mandated, and when a hearing on

16

allegations of misstatements must be accorded." Id. at 167 (emphasis in original).  With respect to evidentiary hearings, the limited scope of the Franks rule was driven largely by the practical observation that "[t]he weight of criminal dockets ... militate against ... added burden[s] on the trial courts," and the concern that, "[if] conducted routinely, ... [such hearings] would be misused by defendants as a convenient source of discovery."  Franks, 438 U.S. 168.

In part to alleviate these concerns, the Franks court ultimately held that a defendant is entitled to an evidentiary hearing on the "veracity of an affidavit in support of a search warrant [only] if he makes a 'substantial preliminary showing' that (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the challenged statement or omission was essential to the finding of probable cause."  United States v. Arbolaez, 450 F.3d 1283, 1293 (11th Cir. 2006)

(citing <u>Franks</u>, 438 U.S. at 155-56).  At the hearing, a search warrant will be voided, and evidence suppressed, only if "the allegation of [material] perjury or reckless disregard is [then] established by the defendant by a preponderance of the evidence." <u>Franks</u>, 438 U.S. at 156.

The Eleventh Circuit Court of Appeals has "noted that [the threshhold] substantiality requirement is not lightly met." <u>Arbolaez</u>, 450 F.3d at 1294.  That court explained that,

> "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood [or omission] or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."

<u>Id</u>. (quoting <u>Franks</u>, 438 U.S. at 171).

18

The magistrate judge recommends that the court find that Ohoro has failed to make the requisite preliminary showing.  Before addressing this recommendation, the court must determine whether to include evidence now proffered by Ohoro in support of his motion--evidence he did not present to the magistrate judge--in its analysis.

### B.  Ohoro's Proffer of Additional Evidence

When a magistrate judge submits his proposed findings and recommendations on a pretrial matter, "any party may serve and file written objections to such proposed findings and recommendations."  28 U.S.C. § 636(b)(1)(C). The district judge is then required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  Id.  In so doing, the district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate."  Id. "The judge may also receive further evidence or recommit the matter to the magistrate with instructions."  Id.

19

While a district judge has the discretion to receive further evidence, courts have appropriately observed that "there are substantial reasons for declining to do so as a general matter." Morris v. Amalgamated Lithographers, Local One, 994 F. Supp. 161, 163 (S.D.N.Y. 1998) (Kaplan, J.); see also Virgin Enters., Ltd. v. Virgin Cuts, Inc., 149 F. Supp. 2d 220, 223 (E.D. Va. 2000) (Friedman, J.). "First, permitting such piecemeal presentation of evidence is exceptionally wasteful of the time of both the magistrate and district judges." Morris, 994 F. Supp. at 163. Second, "there would be instances in which parties would be encouraged to withhold evidence ... in the expectation of using it before the district judge only if they failed to prevail before the magistrate judge on a more abbreviated showing." Id. "Finally, the routine consideration of evidence in support of objections which could have been presented before the magistrate judge would reward careless preparation of the initial papers." Id.

20

In this case, it is noteworthy that defense counsel explicitly stated that his request for a <u>Franks</u> hearing was based in part on information that he expected to elicit at a hearing on the motion to suppress, evidence that he was not, in fact, permitted to elicit. Nonetheless, it is plain that the bulk of the evidence he now offers was (or could have been) available to him <u>prior</u> to the evidentiary hearing.   Indeed, defense counsel has not explained why the affidavits he now proffers were not submitted with his initial motion for a <u>Franks</u> hearing, or as a supplement to that motion.   The magistrate judge apparently expected to see this evidence before <u>any</u> hearing was held, and given the practical concerns that motivated the limitations on the right articulated in <u>Franks</u>, this expectation was not unreasonable.

However, the record also suggests the possibility of miscommunication between defense counsel and the magistrate judge.   For example, the magistrate judge

twice followed an apparently clear ruling on the <u>Franks</u> question with the potentially misleading statement that they would deal with the issue later.  Moreover, it is noteworthy that counsel persistently attempted to provide the evidence to the magistrate judge--including an offer to present it in writing--<u>before</u> the magistrate judge began writing his recommendation.  Thus, the magistrate judge had the opportunity to examine the evidence without prolonging the hearing, but prior to making his ultimate recommendation.

It is also significant that the government has raised no objection to Ohoro's proffer.  The evidence was filed with the court on April 26, giving the government ample time to raise its voice in protest.

For these reasons, the court will exercise its discretion to "receive further evidence," pursuant to 28 U.S.C. § 636(b)(1)(C), and will consider Ohoro's full proffer in ruling on his request for a <u>Franks</u> hearing. In so ruling, however, the court does not condone the

approach taken by defense counsel.  Counsel is warned that, in the future, he is expected to attach his full evidentiary proffer to his initial motion for a <u>Franks</u> hearing, or appropriately supplement his proffer as evidence becomes available.

The court now turns to whether Ohoro has shown that he is entitled to an evidentiary hearing under <u>Franks</u>. (It is only because Ohoro's trial is imminent that the court will conduct this analysis itself, rather than remanding the issue to the magistrate judge.)

## C.  Applying <u>Franks</u>

Ohoro has clearly alleged deliberate or reckless falsehoods and omissions, pointing to specific portions of the warrant.  In particular, he contends that Officer Jones (1) omitted information regarding the confidential informant's unreliabilty; (2) omitted information regarding K-9 Hobbs's unreliability and lack of training; (3) included false information when he alleged that he smelled burnt marijuana emanating from Ohoro's car; and,

(4) included false information when he alleged that K-9
Hobbs alerted on the door seams of Ohoro's car.[8]

To be sure, the last of these alleged falsehoods, and
presumably the second alleged omission, are based on
information provided to, or withheld from, Officer Jones
by the K-9 handler, Officer Steele.  But in conducting a
Franks analysis, the court will "hold the government
accountable for statements made not only by the affiant
but also for statements made by other government
employees which were deliberately or recklessly false or
misleading insofar as such statements were relied upon by
the affiant in making the affidavit."  United States v.
Kennedy, 131 F.3d 1371, 1376 (10th Cir. 1997); Hart v.
O'Brien, 127 F.3d 424, 449 (5th Cir. 1997) ("A
governmental official violates the Fourth Amendment when

---

8.  Having conducted a de novo review of the record,
and having considered Ohoro's objections, the court will
adopt the report and recommendation of the magistrate
judge with respect to the other falsehoods and omissions
that Ohoro identified in his motion to suppress. See Mot.
to Suppress at 10-14.

he deliberately or recklessly provides false, material information for use in an affidavit in support of a search warrant, regardless of whether he signs the affidavit."); <u>cf</u>. <u>Franks</u>, 438 U.S. at 171 ("The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any <u>nongovernmental</u> informant." (emphasis added)).   "[A] different rule would permit government officials deliberately to keep from affiants or the court information material to the determination of probable cause and by such conduct avoid the necessity of a <u>Franks</u> hearing."   <u>United States v. DeLeon</u>, 979 F.2d 761, 764 (9th Cir. 1992).

Having alleged specific falsehoods and omissions, Ohoro must clear two hurdles.   The first is the offer of proof.   To the extent that the court evaluates the <u>strength</u> of Ohoro's offer of proof,[9] the requisite showing

---

9.   At least one scholar has argued that, "Many lower courts have elevated the substantial preliminary showing (continued...)

is "less, of course, than a preponderance of the evidence."   Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 4.4(d).   This is clear, as "Franks expressly states that in order to prevail at the hearing the defendant must prove his claim of perjury by a preponderance of the evidence." Illinois v. Lucente, 506 N.E. 2d 1269, 1276 (Ill. 1987) (emphasis added).[10]  On the other hand, "it is clear that Franks demands something more than a request, and even more than

_____

(...continued)
requirement into a virtually insurmountable barrier by misconstruing the requirement as an authorization to determine the factual merits of the criminal defendant's claim before the evidentiary hearing mandated by Franks." Stephen W. Gard, Bearing False Witness: Perjured Affidavits and the Fourth Amendment, 41 Suffolk U. L. Rev. 445, 464 (2008).  He contends that, "The very notion that a court may properly decide questions of fact before conducting an evidentiary hearing is contrary to the American system of justice."  Id.

10. See United States v. Tate, 524 F.3d 449, 457 (4th Cir. 2008) (finding a "substantial preliminary showing," but "express[ing] no opinion with regard to whether [defendant] will prevail at the evidentiary hearing, where he faces a higher burden of proof and will be required to prove his allegations by a preponderance of the evidence.") (emphasis in original).

a defendant's unsubstantiated denial." <u>Id</u>. "If 'substantial' meant no more than that, <u>Franks</u> hearings would be held in every case." <u>Id</u>. "Thus, the precise standard lies somewhere between mere denials on the one hand and proof by a preponderance on the other[;] ... the preliminary burden must be sufficiently rigorous to preclude automatic hearings in every case, but not so onerous as to be unachievable." <u>Id</u>. at 1276-77.

The second hurdle is materiality; Ohoro "bears the burden of showing that, 'absent [the alleged] misrepresentations or omissions, probable cause would have been lacking.'" <u>United States v. Kapordelis</u>, 569 F.3d 1291, 1309 (11th Cir. 2009) (citation omitted). "If, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." <u>Franks</u>, 438 U.S. at 171-172.

With the above in mind, the court turns to the falsehoods and omissions alleged by Ohoro.

### 1.  Reliability of the Confidential Source

Ohoro argues that, "Officer Jones failed to include any information concerning the reliability of the confidential source or the informant's basis of knowledge." Mot. to Suppress at 11.[11] He contends that, "If any factors about that confidential source impeach the source's credibility--such as pending criminal charges, recent arrests, or an offer of favorable treatment--that information would be highly relevant to a judicial officer's decision concerning probable cause." Id. (emphasis added).

It is clear from the text of Ohoro's argument that it is based almost entirely on speculation. The closest he comes to an offer of proof that such information

_____

11. See also Objections at 5 n.1 ("Ohoro incorporates the argument and citations on pages 10-15 of his Motion to Suppress concerning Franks").

exists, or that it was deliberately or recklessly omitted, is his claim, in a footnote, that, "Portions of the discovery in this case <u>suggest</u> that an informant had recently been arrested by Autauga County." Objections at 15 n.9 (emphasis added). He has not made the threshold offer of proof and thus is not entitled to a <u>Franks</u> hearing on this issue.

The court appreciates, of course, that Ohoro's ability to discover and offer proof is hamstrung by the fact that the informant is confidential. The court also recognizes that "it is in precisely this situation that the Government has the greatest opportunity to falsify affidavits." <u>United States v. Brian</u>, 507 F. Supp. 761, 767 (D.R.I. 1981) (Pettine, J.), <u>aff'd sub nom.</u> <u>United States v. Southhard</u>, 700 F.2d 1 (1st Cir. 1983). But Ohoro has not alleged that Officer Jones manufactured the informant or even that he knew or should have know that the informant was lying. <u>Compare</u> <u>Brian</u>, 507 F. Supp. at 766 ("[D]efendants contend that they never did or said

some of the things attributed to them by these informants.").[12] Rather, he alleges only that the officer might have omitted information that might have impacted the issuing judge's evaluation of the informant's reliability. And, perhaps most significant in this case, there is little reason to conclude that the type of information that Ohoro alleges might have been omitted would have a material impact on the probable-cause determination. As the government points out, "The affidavit already states that the informant has been purchasing drugs from the defendant so the [issuing judge] knows he has committed criminal conduct." U.S. Resp. at 8 (Doc. No. 44).

Although he is not entitled to a Franks hearing on this issue, it is worth noting that Ohoro has identified a potentially significant weakness in the affidavit. It

_____

12. To be sure, the affidavit lacked the sort of specific allegations from the informant that Ohoro could have contested. However, as discussed below, this lack of specificity does the government more harm than good.

30

is well established that: "If an informant is mentioned in the affidavit, the affidavit must also demonstrate the informant's 'veracity' and 'basis of knowledge.'" United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002). In this case, there is no dispute that the affidavit fails to provide any evaluation--positive or negative--of the informant's reliability. See U.S. Resp. at 8 ("Although the affidavit makes no reference to the past reliability of the informant ... [that] is simply a part of what the magistrate has to evaluate.").

To be sure, such a failure is not necessarily of great significance. The magistrate judge correctly noted that, "where there is sufficient independent corroboration of an informant's information there is no need to establish the veracity of the informant." Martin, 297 F.3d at 1314; see also Illinois v. Gates, 462 U.S. 213, 233 (1983) (holding that "veracity" and "basis of knowledge" are "better understood as relevant considerations in the totality-of-the-circumstances

analysis that traditionally guided probable-cause determinations: a deficiency in one may be compensated for ... by a strong showing as to the other, or by some other indicia of reliability."). As discussed below, however, the court finds that Ohoro has made a threshold <u>Franks</u> showing with respect to allegations that might otherwise provide the necessary "independent corroboration."

## 2. The Reliability of K-9 Hobbs

As in the case of the confidential informant, Officer Jones's affidavit contains no information--positive or negative--regarding K-9 Hobbs's reliability as a drug-detecting dog. Courts have held that, "To establish [a] dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs." <u>United States v. Sundby</u>, 186 F.3d 873, 876 (8th Cir. 1999); <u>United States v. Kennedy</u>, 131 F.3d 1371, 1377 (10th Cir. 1997) ("[A] search warrant based on a narcotics canine alert will be sufficient on its face if the affidavit

states that the dog is trained and certified to detect narcotics."); <u>United States v. Lingenfelter</u>, 997 F.2d 632, 639 (9th Cir. 1993) ("A canine sniff alone can supply the probable cause necessary for issuing a search warrant if the application for the warrant establishes the dog's reliability."); <u>see</u> <u>also</u> <u>United States v. Anderson</u>, 2010 WL 597230 at *2 (11th Cir. 2010) ("While a dog sniff must be sufficiently reliable in order to establish probable cause, we have held in dicta 'that training of a dog alone is sufficient proof of reliability.'").   The affidavit in this case merely refers to Hobbs as a "K-9" and indicates that he "alerted" on the car door seams, money, and bag. Presumably, the issuing judge was to infer from the term "K-9," and the context in which Hobbs was used, that the dog was trained to identify drugs.

Regardless of whether such an inference is reasonable, Ohoro's <u>Franks</u> argument goes beyond the failure to establish reliability; he argues that Officer

Jones "failed to disclose that Hobbs was not properly trained and certified as a drug-detecting dog." Objections at 14; United States v. Donnelly, 475 F.3d 946, 955 (8th Cir. 2007) (citation omitted) (The "defendant would have been entitled to a Franks hearing had he shown that officers withheld negative information casting into doubt the dog's reliability."). In support of this argument, he offers the affidavit of his expert, Steven D. Nicely, which, he contends, "detail[s] the deficiencies in the dog's training and certification." Objections at 14.

With respect to proper certification, Ohoro notes that Officer Steele failed to produce documentation that Hobbs was certified as a drug-detecting dog after March 28, 2008.[13]  Nicely states, in his sworn affidavit, that

---

13. A subpoena in this case required production of "All records pertaining to the training of the drug dog employed in this case[,] [a]ll reports concerning all stops involving the drug dog involved in this case[,] and any files concerning standard drug dog procedure and files of the drug dog's error rates."  Subpoena at 1
(continued...)

"a dog that goes longer than a year without evidence of certification is not considered, by [some] industry standards, to be certified." Nicely Aff. at 2 (Doc. No. 66-3).

As noted above, however, Officer Steele testified under oath that Hobbs was certified "annually up to the year two thousand and nine." Evid. Hr.'g Trans. at 97:7. Both officers also testified that Hobbs had been a reliable drug-detecting dog. Indeed, Officer Steele testified that he "would ... be surprised if [Hobbs's] false [positive] rate was more than five, eight per cent." Id. at 107:4-5. See Anderson, 2010 WL 597230 at *3 (finding that a dog with "a 55% accuracy rate in finding measurable amounts of drugs" was sufficiently reliable).

"[W]hile training and performance documentation would be useful in evaluating a dog's reliability," it is not

_____

(...continued)
(Doc. No. 19); see also Order (Doc. No. 20) (granting requested subpoena with respect to the dog's records).

necessary.  United States v. Diaz, 25 F.3d 392, 396 (6th Cir. 1994) (finding that "the testimony of [the dog's handler] sufficiently established the dog's reliability."); see also United States v. Boxley, 373 F.3d 759, 761 (6th Cir. 2004) ("[I]n order to admit evidence of a dog's alert to an aroma of drugs, it is not necessary to provide the dog's training and performance records, as it is similarly unnecessary to qualify a human expert in this way.  Rather, testimony as to the dog's record is sufficient.").  Thus, the lack of documentation is not, in-and-of-itself, proof that Hobbs is unreliable.[14]

Given the officers' testimony and the fact that documentation shows that Hobbs was trained and certified through March 28, 2008 (just 16 months before the alerts at issue in this case), the court finds that Ohoro has failed to make a substantial preliminary showing that

---

14. Significantly, and as noted above, Officer Steele provided an explanation for the missing records.

Officer Jones deliberately or recklessly failed to inform the issuing judge that Hobbs was <u>not</u> certified, or that he was <u>un</u>reliable, as a drug-detecting dog.

Ohoro also argues that, "The warrant affidavit ... omitted that Hobbs had not been trained off general circulation currency." Objections at 14. Although hardly a model of clarity, the gist of his argument appears to be that, due to deficiencies in the dog's training, Hobbs's alert on the money was of little probative value (that is, it was an unreliable indication that the money had recently been contaminated by drugs) and thus the officers should have somehow communicated this information to the issuing judge in the affidavit. <u>See</u> Objections at 15 ("Without the necessary information concerning the uselessness of such a purported 'alert,' both the state-court judge and the U.S. Magistrate Judge were misled by Officer Jones's affidavit.").

In support of this argument, Ohoro offers Nicely's sworn statement that "It is common knowledge in the

detector-dog training industry that currency in general circulation is contaminated with significant amounts of illegal narcotics," Nicely Aff. at 3, and that "research demonstrates that the canine nose ... is capable of detecting the trace amounts of narcotics present on nearly all general circulation currency," id. at 4.  He also points to Officer Steele's testimony that Hobbs was trained using actual cocaine and not pseudo cocaine, see Evid. Hr'g Tr. at 92:20-25, and argues that the dog thus "would not have been able to make a reliable alert to general circulation currency," Objections at 15 n.8.

The court need not address whether Ohoro has, with this evidence, made a substantial preliminary showing of deliberate or reckless omission, as it finds that this information is not material.  The fact that Hobbs alerted on the money adds little to the probable-cause determination.[15]  Put somewhat differently, it is the

_____

15. Indeed, this conclusion is suggested by Ohoro's separate and more general argument that a "drug dog's
(continued...)

possession of $ 4,400  in cash by an unemployed man that plays a significant role in determining whether there is probable cause to search Ohoro's home, and not the fact that Hobbs also "alerted" to the money.

### 3. The Smell of Burnt Marijuana

Ohoro offers a variety of circumstantial evidence as proof that Officer Jones lied about smelling "burnt marijuana" emanating from Ohoro's car.  First, he notes that no drugs--or other evidence of burnt marijuana--were found in his car.  Second, he points to the apparently

---

(...continued)
'alert' to a large amount of currency is meaningless because the vast majority of currency is contaminated [with drugs]."  Objections at 16, n.10; Mot. to Suppress at 21-23 (citing multiple cases questioning the reliability of a drug-dog's alert to currency given drug contamination); Nicely Aff. at 4 ("[T]he canine nose is capable of detecting the trace amounts of narcotics present on nearly all general circulation currency."); see also U.S. Resp. at 14 n.2 ("The alert on the money is but one fact in that affidavit.  Taken out of context of the other facts in the affidavit, the frequency with which currency is found to be contaminated with narcotics residue might seem of vital importance.  However, when placed in the context of this case, it is of little importance.").

pretextual nature of the traffic stop, arguing that
"Officer Jones followed [him] 14.8 miles from his home
and pulled him over for 'speeding' even though Officer
Jones had neither a radar gun nor a calibrated
speedometer (and thus no valid tools from which to
determine that a car was speeding)." Objections at 12
(emphasis in original).[16] Third, he emphasizes the
context in which the allegation was made, noting that
before the stop, Officer Jones had engaged in "two weeks
worth of surveillance [of Ohoro's residence] that
indicated nothing illegal." Id. As Ohoro describes it,
"the only break in the case occurred when Officer Jones

_____

16. Officer Jones admitted that, "Due to the fact I
didn't have the radar or certified calibration, I wrote
[Ohoro] a warning citation for going approximately
seventy miles per hour in a fifty-five mile an hour
speeding zone." Evid. Hr'g Tr. at 15:12-15; see also
United States v. Monzon-Gomez, 244 Fed. Appx. 954, 959
n.3 (11th Cir. 2007) (unpublished) (noting "that visual
observation alone, unaccompanied by evidence of speeding
generated by a properly tested 'speed measuring device,'
Ala. Code § 32-5A-177, would be insufficient as an
evidentiary matter to successfully prosecute a speeding
violation in court under Alabama law.").

decided to follow Mr. Ohoro, pulled him over, and claimed to have smelled burnt marijuana." Id. Ohoro reasonably maintains that, "An officer's claim to smell that odor in a completely unrelated, coincidental interaction with an unknown driver [sh]ould be weighed differently than the same claim with respect to a driver whom that officer is already investigating for marijuana-related charges." Mot. to Suppress at 14. Fourth, he offers the sworn affidavit of Howard Jones, who "describes several fabricated traffic stops, illegal searches, harassing behavior, and improper use of the drug dog by Officer Jones," thereby attacking the officer's credibility. Objections at 13; see generally Jones Aff. (Doc. No. 66-2).

Examined together, this evidence clearly raises questions about the veracity of Officer Jones's allegation. And one additional proffer clearly pushes the combined evidence across the threshold: Ohoro's credible assertion that he does not smoke marijuana. See

Franks, 438 U.S. at 171 (stating that offers of proof should be accompanied by "[a]ffidavits or sworn or otherwise reliable statements of witnesses") (emphasis added).  As Ohoro explains,

> "[I]n the days after his arrest, [he] confessed to agents that he used methamphetamine on the weekends and said that he did not like that because he was struggling with his will power and that methamphetamine was easy to abuse.  He also discussed in detail, at the agent's request, his marijuana-selling activities.  However, he told agents: 'it's been over 20 years since I smoked pot.' [He] told officers that he did not like the way marijuana made him feel. This conversation occurred well into [his] interrogation concerning the details of his marijuana distribution. [He] had no reason to lie to officers about that fact, especially considering that he had just admitted to much more serious felony offenses (possession of methamphetamine and distribution of marijuana) and to using a much more serious drug (methamphetamine)."

Objections at 11-12 (internal citation omitted).  To be sure, the instant discussion belies his assertion that he "had no reason to lie."  But his statement does bear strong indicia of reliability; it seems unlikely that he

would confess to more serious criminal activities and lie about his marijuana use. At the very least, this statement is more reliable than a self-serving affidavit prepared for the express purpose of obtaining a <u>Franks</u> hearing. <u>Compare</u> <u>Lucente</u>, 506 N.E. 2d at 1277 ("Had the defendant's proffer consisted solely of his own affidavit asserting 'I didn't do it,' that would amount to an unsubstantiated denial, and that would be plainly insufficient.").

The court finds that Ohoro has made a substantial preliminary showing that Officer Jones deliberately included false information in the warrant affidavit when he alleged that he smelled burnt marijuana emanating from Ohoro's car. It is arguable whether removal of this allegation alone would have a material impact on the determination of probable cause. However, if the allegation discussed below is also removed, the impact is clearly material.

43

### 4.  K-9 Hobbs's "Alerts" on the Door Seams

Finally, Ohoro argues that, "Hobbs could not have alerted in the manner claimed, including the dog's purported 'alert' to door seams on opposite sides of the vehicle."  Objections at 16.[17]  As proof, Ohoro again offers the affidavit of Nicely, who states that:

> "Officer Steele ... testified that, after walking Hobbs around the vehicle, the dog responded to the door seams on the passenger and drivers doors.  In all my combined 35 years experience with detector dogs, including military service, law enforcement, and detector-dog training, which includes thousands of vehicle sniffs, I have never observed a dog respond or 'alert' to both door seams on opposite sides of a vehicle based on narcotics located in the

_____

17. This argument and the associated offer of proof appear in a section of Ohoro's brief titled, "The Magistrate Judge Improperly Denied Ohoro's Submission of Relevant Evidence at the Suppression Hearing," see Objections at 15-17, not in the preceding section titled, "Mr. Ohoro Is Entitled to a Franks Hearing," see id. at 5-15.  Nonetheless, it is clear that Ohoro views them as an extension of his Franks claim. See id. at 17 ("[T]he evidence demonstrates that Hobbs likely did not 'alert' at all in this case, which constitutes another material inaccuracy in the warrant affidavit that would have been relevant to probable cause.").

44

> vehicle.  As Officer Steele acknowledged
> during his testimony, odor travels with
> wind and air currents.  Thus air leaving
> a vehicle is detectable to the dog only
> moving in one direction."

Nicely Aff. at ¶ 13.

Ohoro also offers evidence that the officers have manufactured alerts in the past.  In a sworn affidavit, Howard Jones discussed three traffic stops involving himself, Officer Jones, and Officer Steele.  He states that during one of those stops,

> "Jim Steele walked his dog around our
> car.  Jim Steele stopped at the drivers
> door and tapped the door.  The dog got
> excited, jumping up and down, and
> yelping.  Officer Steele told Officer
> Jones that the dog 'hit' on my door.
> The two officers then began search our
> car.  They searched our car for at least
> 2 or 2 ½ hours. ... Officers found no
> illegal narcotics."

Howard Jones Aff. at ¶ 15-16.

When combined with the information discussed above-- particularly the pretextual nature of the stop, the failure to locate drugs or drug paraphernalia in the car and the fact that Officer Jones had been monitoring

Ohoro's residence for two weeks with no sign of criminal activity--the court finds that Ohoro has made a substantial preliminary showing that Officer Jones deliberately included false information when he stated that K-9 Hobbs alerted on the seams of Ohoro's car doors.

The court also finds that the allegations regarding the smell of burnt marijuana and K-9 Hobbs's door seam alerts are material to the issuing judge's finding of probable cause to search Ohoro's home.  Without these allegations, all that is left to corroborate the informant's story <u>and</u> independently contribute to the probable-cause determination is that a drug-dog made a questionable alert on $ 4,400 carried by an unemployed man with unspecified prior convictions.[18]    More

---

18. It should be noted that the magistrate judge found corroboration, in part, in the fact that the informant accurately "told the officers that Ohoro was a convicted felon ... and gave the officers the correct address of Ohoro's residence." Report at 11.  But this information is publicly available and thus provides only the weakest form of corroboration.  <u>See, e.g.</u>, <u>United States v. Tuter</u>, 240 F.3d 1292, 1297 (10th Cir. 2001) (continued...)

importantly, if Ohoro establishes that these allegations were false, the officers lacked probable cause to search his car and thus could not rely upon evidence discovered during that search to obtain a search warrant for his residence.   United States v. Karo, 468 U.S. 705, 719 (1984) (Unlawfully obtained "information, which was included in the warrant affidavit, would ... invalidate the warrant for the search of the house if it proved to be critical to establishing probable cause for the issuance of the warrant."); see also Wong Sun v. United States, 371 U.S. 471, 488  (1963) (The question is "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality

---

(...continued)

("Almost anyone can describe the residents of, and vehicles at, a particular home without having any special knowledge of what goes on inside."); United States v. Ingram, 1993 WL 5914 at *1 (6th Cir. Jan. 13, 1993) (per curiam) (unpublished) ("[M]erely verifying public information such as addresses, phone numbers, license numbers, and even criminal records is not sufficient to corroborate an informant's statement.").

47

or instead by means sufficiently distinguishable to be purged of the primary taint.'") (citation omitted).

Thus, Ohoro is entitled to a hearing on the veracity of the above-discussed allegations. "Whether he will prevail at that hearing is, of course, another matter." Franks, 438 U.S. at 172. (Again, it is only because Ohoro's trial is imminent that the court will conduct this hearing itself, rather than remanding the issue to the magistrate judge.)

***

For the foregoing reasons, it is ORDERED as follows:

(1) Defendant William Walter Ohoro's objection to the magistrate judge's recommendation that the court deny his request for an evidentiary hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) (doc. no. 67), is sustained in part and overruled in part. The court's rulings on defendant Ohoro's additional objections will be addressed in a later opinion.

48

(2) The magistrate judge's recommendation (doc. no. 64) is adopted in part and rejected in part as to defendant Ohoro's motion for a <u>Franks</u> hearing.

(3) Defendant Ohoro's motion for a <u>Franks</u> hearing (doc. no. 36) is granted to the extent that he is entitled to a hearing on the veracity of Officer Tijuan Jones's allegations that, during a traffic stop on July 28, 2009, "there was a[n] odor of burnt marijuana emitting from the cock pit area of [Ohoro's] vehicle," and that, "K-9 [Hobbs] alerted on both driver and passenger doors." Aff. at 1 (Doc. No. 36-2).

(4) Defendant Ohoro's motion for a <u>Franks</u> hearing (doc. no. 36) is denied with respect to the other falsehoods and omissions that he alleged in his motion to suppress. Having conducted a de novo review of the record and having considered defendant Ohoro's objections, the court agrees with the magistrate judge's recommendation to this extent.

(5) A <u>Franks</u> hearing, to the extent authorized by this order, is set for July 22, 2010, at 10:00 a.m. in Courtroom 2FMJ of the Frank M. Johnson Jr. United States Courthouse Complex, One Church Street, Montgomery, Alabama.

DONE, this the 16th day of July, 2010.

<u>   /s/ Myron H. Thompson   </u>
UNITED STATES DISTRICT JUDGE